Next case is 5-18-0391, Pamela Johnson v. Seville Holdings Whenever you're ready Good morning. May it please the Court, Mr. Traitor? Your Honor, we're here before you today because there was a motion for summary judgment that was granted by the underlying trial court in this particular matter. Would you introduce yourself? My apologies, Your Honor. My name is John Mark Holmes, with the law firm Westminster Legal Group, representing the appellants in this matter. Seville Holdings, LLC, and R. Adam Hill. Thank you, Your Honor. Your Honor, we're here before you today because a motion for summary judgment was granted by the trial court. We submit to the Court that it was improperly granted because there are contested issues which are objective and substantially supported by the facts. And also, the plaintiff in this case, who is the appellee, was not entitled to judgment as a matter of law. The Court, in this particular case, because it's to contest a motion for summary judgment, is at a de novo review. And specific issues that are presented are whether the record contains numerous and consistent facts supporting defendant's allegations that the subject loan was forgiven, whether the trial court's judgment was proper in light of the evidence while conflicting, reflect that the plaintiff released a security interest and forgave the note, and waived payments. And third, whether the summary judgment on count two of the plaintiff's complaint was proper, or a personal guarantee in issues that are not a negotiable instrument. Your Honors, I think it's worthwhile to review a little bit of the history, which are evidence on the record of this particular case. The party's relationship with the appellee, Mr. Clyde E. Byenforth, began as early as 2005. This is when they first were introduced and started to conduct business. And quickly, over the next few years, the parties enjoyed what could easily be characterized as a mentor-mentee relationship. Some witnesses have characterized the relationship as almost familial. And this is germane to the extent that a lot of the business that the parties conducted between each other were not arm's length transactions. Many of these deals and arrangements were struck verbally. For example, the appellant's position in this particular case was that the promissory note that is an issue was verbally discharged. And in that regard, I think it's also worthwhile to point out to the Court that there are three documents which are core to this appeal. The first being the promissory note, which was executed in 2007, a concurrent payment guarantee, as well as a security instrument, a securing collateral. The facts on the record, again, are contested. We acknowledge that. But for that very reason, Your Honors, we believe that the motion for summary judgment was improvidently granted. From the defense perspective, from the appellant's perspective, there's evidence regarding the verbal discharge. There's evidence that following the discharge, which occurred as early as 2010, Your Honors, there was an arrangement reached between the parties in which the appellants agreed to certain allocations of capital and property to the benefit of the now-deceased appellee. Which resulted in enormous tax savings and advantages to the appellee at the time. And this was all, of course, to the detriment of the appellants. Furthermore, the appellants agreed to manage the business, which was formed, again, in about 2010, with no compensation. And allow me, and I beg your forgiveness, let me take a step back. The meat of the parties' dealings began in 2007, 2008, where the appellants and the appellee jointly went into some real estate development projects. Given the time with economic condition at the time, we're talking about 2000, 2008, 2007, 2008, unfortunately, these endeavors were not successful. And, in fact, both parties lost significant amounts of money, particularly the decedent appellee. Now, in order to recoup, to help the appellee recoup some of the losses, they agreed to form a new company under the name of TBHP LLC, under which they would engage in additional developments and also certain allocations of land to hopefully offset some of the losses that the appellee suffered by certain tax advantages and savings. Now, back to where I was before. In managing the company, the appellants agreed to forego any kind of compensation, other than to maybe recover some hard costs that they incurred on behalf of the business, on behalf of TBHP. There were regular monthly reports, several of which clearly stated to, which were prepared by the appellants and their accountants and submitted to the appellees, which clearly indicated that the note was forgiven and that the amounts under the note would not be repaid. And there have been no objections in writing that the appellees have been able to produce, which contradict that fact, Your Honors. There have been absolutely no demands for payment, even in spite of the fact that there were no payments made during this 10-year period, between 2007 when the note was originally executed and 2017 when the lawsuit was commenced. There were no interest payments. There were no demands whatsoever until, unfortunately, the appellee began a steady and fast decline in terms of his health and his mental condition, specifically as it relates to the appellee's memory. And as I previously mentioned, the appellee has recently passed away. Doesn't the UCC require a signed, written waiver to waive the obligation on promissory notes? Your Honor, it could be argued that, and since you addressed that now, There isn't one in this case, correct? No, Your Honor. There is not a written release on this particular case for a discharge. But the totality of the other facts demonstrate that the discharge was voluntary, based on all the other evidence that we have provided to the trial court, and in response to the motion for summary judgment, which we've asked the court to consider today. And in that regard, since you raised the issue, Your Honor, Section 3-604 of the UCC speaks to a voluntary discharge. And in that section, it specifically states that a person intended to enforce an instrument may, with or without consideration, discharge the obligation through an intentional and voluntary act. And it says, such as. And the examples that the statute provides after the phrase, such as, we argue is more illustrative, just because of the plain interpretation of that particular phrase. It doesn't say specifically that it must entail a surrender of the instrument, or a destruction or mutilation of the document, or a cancellation, or additional words on the instrument itself. And we also ask you to take a look at subsection 2A2 of that particular section, Your Honors, where it says that it can also be discharged by agreeing not to sue, or otherwise renouncing rights against a party by assigned writing. There is a disjunctive or, which is important in this context, Your Honor, and the punctuation suggests that it's not always necessary for the discharge to be in writing. So if I may go back to some of the other facts, Your Honors, regarding some of the evidence on the record. There were, again, no interest payments or payments whatsoever made during the entire 10 years that the bill was in effect. There were absolutely no demands from the appellee during that time. And, in fact, the only written demand that was made to the appellants for the repayment of the loan was shortly before this case was commenced. It was prepared by the attorneys. Again, this was all during the time in which the appellee was in declining health and his memory was not there. And, quite frankly, Your Honors, it's my understanding that that's precisely the reason we're here today. It's because, unfortunately, due to the close relationship, I shouldn't say unfortunately, but due to the close relationship that the parties had during the course of their business and their friendship, again, not many of their dealings were arm's-length transactions. A lot of them were verbal. A lot of them were handshake deals. And very importantly, Your Honors, since we have gone into the UCC, I'd also like to mention that the trial court ignored Section 3-605F of the UCC, which addresses the impairment of collateral. It's significant in this case, Your Honors, that the appellee released a security interest that secured the collateral for the note. What happened, Your Honor, and the evidence on the record will reflect this, was that Mr. Bonifor released the security in writing and ultimately took that property back into his own possession. And the value of that property was allocated towards his interest in the business, in TBHP LLC. Now, essentially, for practical effects, that's double-dipping, Your Honor. You can't, you know, enjoy the benefits of taking the land and also requiring the payment on the note after taking the collateral. For legal purposes, that should have operated as an offset, Your Honor. And there's no—and the appellee cannot make an argument to really challenge that proposition. And to the extent that the appellee would not like to argue that the appellant did not suffer any detriment as far as the release of that security interest, and the appellee taking that property and having that allocated towards his own ownership and interest to mitigate his tax liabilities and to provide a tax advantage and savings to him, certainly the appellants, Your Honors, did not benefit from that. Essentially, they were deprived of the right of the offset, as I mentioned before. But ultimately, they lost the land. So it can't be said that they didn't suffer a detriment in the situation, Your Honors. Finally, I think it's important to also address the guarantee. The guarantee is important here, Your Honors, because it's our—we respectfully submit to the Court that the guarantee is not a negotiable instrument that is governed under the Uniform Commercial Code. Under Section 3104, all the promises and conditions concerning the guarantee must be stated in the guarantee itself. And if the Court would examine the guarantee itself, you'll notice that it mentions a promissory note but doesn't go into any of the guarantees. And more importantly, Your Honors, the mention of the promissory note is in the recitals. It's not in the enforceable portion of the guarantee itself. And in that regard, Your Honor, we don't believe that the payment guarantee can be ruled upon or decided in the same fashion that the promissory note itself was. Ultimately, Your Honors, what we would request is this Court reverse the trial court's motion for summary judgment with an instruction to the trial court to proceed the trial. And Your Honor, I yield my time to the appellee. Thank you very much. Thank you. We'll have time to move on if you so wish to use it. Mr. Schroeder. May it please the Court, Your Honors. My name is Kurt Schroeder. I'm with the law firm of Green's father, Hemkern Gamble, and I represent the plaintiff's appellee in this case. If I could, I'd like to, you're probably aware that the plaintiff has deceased. He was deceased at this time, I think in November, I filed a suggestion of death and the Court did allow a substitution of his daughter as the independent executor, as the appellee. So throughout this, if I could just refer to him as the plaintiff or Mr. Binefort, I would appreciate that. As you probably gather, I'm sure you've read the brief, so this is a pretty simple matter. This is dealing with a loan made by an 85-year-old individual to a much younger person, and it was a $200,000 loan that he made. In conjunction with that loan, he required that there be a promissory note, which you have seen. It was dated October 22, 2007. There was also a personal inner key, because the promissory note was made by Seville Holdings LLC, Linton Liability Company, under the state of Illinois, and it was a single member LLC. And so the one single member was R. Adam Hill, who was the other defendant in this case. And Mr. Hill did sign, as of the same day, October 22, 2007, the same day as the promissory note, he signed a personal guarantee. And if you look at the personal guarantee, it specifically says, Lender declined to grant the loan reflected in the note unless guarantor guarantees payment of the note, and guarantor is willing to do so. So the only reason this loan got made in the first place was because there was going to be this personal guarantee by the single member of the LLC. Now, Mr. Palm states that what good friends these people were, and that they did everything on a handshake. Well, clearly, Mr. Bineport did have the foresight and did not see a need to go around and just have a handshake on this. He did require that there be a promissory note and a guarantee. He wanted to make sure the loan was properly documented, which he did. Now, it's undisputed that neither Seville or Hill ever made any payments to Mr. Bineport for a period of 10 years. When Mr. Bineport's deposition was taken, he did state that he did make demands orally from time to time with Mr. Adam Hill. Never received anything. And then, yes, there was a formal written demand made in 2017 before the lawsuit was filed for this loan to be paid. And at this time, nothing has ever been paid by the defendants. What the defendants' whole defense is here is that they're saying, Mr. Bineport forgave that. It was either a verbal forgiveness, or it was because of some of these other fuzzy things that are being thrown out here about, well, the form was TBPH, LLC, and somehow that was a forgiveness of this loan. No, that just doesn't cut it, in my opinion. There has to be something concrete and unequivocal to show that there was a forgiveness or a waiver of the debt and the loan. And in Mr. Bineport's answers to interrogatories, he unequivocally states that he never waived or forgave the debt. Was he asked about that in the deposition? Excuse me? Was he asked about that in the deposition, too? I believe he was. I don't believe the deposition is a part of the record at this time. Okay. Okay? I guess on that point also, I would like to take exception to Mr. Holmes having alluded to my client's mental health and what have you. He did have his deposition taken. There was no issues there. And I don't think there's anything in the record that would suggest that my client was in poor mental health. He was an elderly man. He was, at the time of the deposition, he was probably 93 or 94, but he was not mentally unhealthy. Okay. So the depositions were not attached to any motion for summary judgment? Some depositions were. I know I attached his son-in-law's deposition. I'll speak to that in a few minutes also. But Mr. Binecore, Mr. Holmes did take a video deposition of my client. And that was not part of the summary judgment. Now, while we're on that subject, about documentation as far as this goes, neither Abbott Hill or Seville ever received from a plaintiff any type of documentation that said that Mr. Binecore was forgiving or in any way releasing this debt that was owed. And that's undisputed. Plaintiff's son-in-law, Jeff Killigan, who I did mention, his deposition was attached, but it's part of the record here. You'll see in his deposition that he testified at a meeting with Mr. Hill in March of 2017. Hill confirmed to him that the debt that was under the note was, in fact, owed. And so there was a recognition before the lawsuit was filed that, yes, that debt was still outstanding and owing. You know, defendants, they make these big and conclusory allegations of forgiveness or waiver. And somehow that by establishing this other LLC, this TBPA, somehow that constituted a forgiveness or a waiver by Mr. Binecore. I just don't get it. You know, the debt was well documented. The defendants don't have anything concrete to show that there was this alleged forgiveness of a debt. And, you know, they have to come up with something. I've cited a couple of Fifth District cases, but you can't just throw out these allegations, these conclusory allegations of facts and expect that it's going to be something without any sort of need under it. Otherwise, you don't get past a summary judgment motion. Well, the other thing is that if we don't have something in writing, what's to prevent anybody who's a borrower from always saying, he said he forgave that debt to me. We've got to have some certainty in that regard. And, you know, the plaintiff did unequivocally stay under oath in the answers to her auditories, but he never forgave or waived in any fashion the indebtedness and the promissory note, or the guarantee, for that matter. You know, it's simply to me, it's unbelievable for the defendants to say that they were just so close and comfortable with each other that, you know, he would have felt like he was somehow offending Mr. Bynford to ask for a written release. That just doesn't make sense. If you're getting a $200,000, that's a pretty big chunk of money. And if you're getting released from that, I think any reasonable person is going to say, I want that in writing. I want to see it in writing that there's a release here. And that's the protection you have in the future. I mean, even the trial court observed in the summary judgment hearing that they were such good friends. Well, he still did require a promissory note. He wasn't going to go without documentation of a promissory note. The next thing is that the defendants allege that the debt was released in 2010. You'll find in the record there's a release with respect to a piece of real estate. And that was dated July 15th, 2013, the date of recording. And it was dated actually May 21st of 2013. And in that release of lien, which is at C212 to 213, the release specifically says, The release of the note as a lien, claim or encumbrance against the property, does not release the maker of the note from the obligation to pay the note in accordance with its terms. So clearly, Mr. Byford's intent in 2013 was at that moment still outstanding, despite the allegations that it was forgiven in 2010. And so that was a record. The release of lien shows that the grantee was Sobel Holdings, LLC. And Sobel Holdings got the benefit of that release because they had a piece of property free of Mr. Byford's security. And so, you know, really there was, you know, they argue that somehow there was this impairment of, well, no, there was a benefit that went to the defendants here. Because Mr. Byford had some security in a piece of real estate and he gave that up. And the defendants did get that benefit. And I think it's important to keep in mind here too that we've got this single member LLC. And Bill is the alter ego here. He's the one operating everything here. And that they're really one and the same when you're talking about, you know, the maker of the note or the guarantor. They're the same ones here. It's not a situation where you have some big corporation with a lot of stock to produce and one person may be who's one of the shareholders of the guarantor. No, you've got here a situation where we've got one member of an LLC and a DLLC. And, you know, even in the fill in this deposition that he could make the funds, initially, if you look at the record, the check was made payable to Warren Hill. And that's at C-267, a check for $200,000 made payable to him. And Mr. Hill testified in his deposition that, well, he got the check made payable to him and then he committed the funds, he put it into account that he jointly had with Seville Holdings. So we were all one and the same here. And then finally, I guess in addition, the fill in this, you know, bring up this business about, well, we can't produce the original promissory note. Well, nobody's ever asked for the original promissory note. It never came up in any of the proceedings of the trial court about an original promissory note. And it is interesting to note that the promissory note was recorded for some reason, which is unusual, but it was recorded in St. Clair County, Illinois, on October 26, 2007. And it does say on here, returned to Orlando Hill, and it's his address. So once the note, the original note was recorded, it obviously went back to Mr. Hill. So he would have been in possession of it at least for some period of time. And finally, I mean, the trial has cited several 1,800 cases, but I agree that the UCC is now controlling provisions on this. And we cited Section 3-604. It does require, you know, some type of affirmative, intentional act to forgive a debt. And we just don't have anything like that here. It's just nonexistent. Excuse me? Is there any one of those actions mentioned in the UCC that is an action that does not involve a writing or a physical act? It says an intentional, voluntary act such as surrender of the instrument to a person. So if Mr. Binefort handed the note back, that would be one way. Destruction, mutilation. You could destroy or mutilate like you can do at will. Or cancellation of the instrument. Or cancellation or striking out of the party's signature. Or the addition of words on the instrument indicating discharge, so you could take the note and write on it, paid in full or something, I guess. Okay? Or you could also, another alternative would be by agreeing not to sue or otherwise renouncing rights against the party by assigned writing. Okay. We don't have any assigned writing, clearly. And then also, the defendants bring up this business about Section 3-605 with respect to the guarantee. And again, our contention is that the promissory note and the guarantee were done at the same time. They were really one and the same part of the same transaction. And that nothing should, you know, considering the alter ego nature of Mr. Hill and his single member LLC, should thwart that. Also, I did find something else just yesterday. As a matter of fact, I was looking at Section 3-605 of the UCC. And it has these notes at the end, the comments at the end of that. And comment number 9 says, The importance of the surety ship defenses provided in Section 3-605 is greatly diminished by the fact that the right to discharge can be waived as provided in Section F. The waiver can be effectuated by a provision in the instrument or in a separate agreement. With a standard practice to include such a waiver of surety ship defenses in notes prepared by financial institutions or other commercial creditors. Now, I look at the promissory note here, and I don't see that type of waiver on surety ship defenses. So that's out. But then it goes on to say that Section 3-605 will result in the discharge of an accommodation party on a note, only in the occasional case in which the note does not include such a waiver clause, and the person entitled to enforce the note nevertheless takes actions that would give rise to a discharge under the section, without obtaining the consent of the secondary obligor. So that the secondary obligor, like the guarantor here, can consent. And then it goes on to say that the last sentence of Subsection F creates a difference of consent on the part of the secondary obligor whenever the secondary obligor controls the principal obligor or deals with the creditor on behalf of the principal obligor. That's what we have here. We've got the secondary obligor is the one who's controlling the principal obligor on the promissory note. Like I said, we've got this alter ego thing. It's one and the same. And so I think that 3-605 really does not have any application here. You know, the bottom line of all this, I believe, is that we've got to have some certainty in loans that are made, if they're forgiven or not. And the clearest way to show that the loan is forgiven is for it to be in writing. That's not the case here. And I think that any time that someone is foolish enough to not obtain a written release for a promissory note amounting to $200,000, the risk of that failure to obtain that should be on that person. They've got the last chance to avoid a lot of issues. So for those reasons, we would ask that this court affirm the trial court's ruling. And I appreciate your time. Thank you. Mr. Hines, you have five minutes. We'll move right over to you. Thank you. Your Honors, I think, if anything, the response in these oral arguments really clearly demonstrates to the court that, in fact, there are contested objective facts that are present in this particular case that should have defeated the motion for summary judgment. What we have here are not just conclusive remarks or defenses that were made, but defenses that were clearly supported and substantiated by facts. Many of the most significant facts, which I previously presented in my opening arguments, Your Honors. I would like to say that can you specifically point to a material fact that is disputed in the record that the judge should not bring summary judgment? Let me provide you with an answer, Your Honor, approaching your question from a different angle. Your Honor, the ultimate issue in this case is whether or not the note and the guarantee were discharged. And in that regard, there certainly is a statute there under the UCC, which the appellees are relying upon to say that the obligation was not dismissed. We are presenting facts that are part of the record that have been presented in evidence, which show that there was a voluntary act supported by other facts, which show that, in fact, Mr. Byford did intend to and did release the payment obligation. You heard counsel or appellee read off all the actions that one forgiving and promissory note must take in order to make an act of forgiveness of a guarantee or of a note. So which of those actions is in the record that creates that disputed material fact? Well, certainly, Your Honor, I think that if it was just decided upon that one particular section of the UCC, then this case would be an easy one. However, there is more than just that one section in play on this appeal, Your Honor, specifically the one relating to the impairment of the collateral. And I think that's why the Court of Appeals is so critical of this case. It's a case that, in effect, provides the appellants an out that is being sought in this particular case. Again, relative – the appellant is trying to have this Court look at everything in a vacuum. And granted, the way that this appeal is framed and the motion for some adjustment is framed, this Court cannot appreciate or understand really the context of the relationship between the parties. And I understand that. But, Your Honors, at the end of the day, with all the other facts that have been presented in the briefs and on the record, you'll see that ultimately the trial court weighed the facts, Your Honor, which is improper for deciding on a motion for summary judgment. And in fact, the rule is that a motion for summary judgment can't be appropriate if there's a dispute as to any material fact, material fact being whether or not this – the payment obligation was discharged, whether reasonable persons could draw different inferences from the evidence, which we submit they can based on the prior significant points that I made earlier this morning. And finally – What is that evidence? That's the question. What is that evidence? It could be disputed. Well, Your Honor, just to quickly review the fact that there was a verbal discharge, that there were various allocations that were made for the appellant's benefit in connection with that agreement that the parties struck as early as 2010. The specific monthly reports in writing that were submitted to the appellee, prepared by the appellant and their CPAs, expressly stating that the note was forgiven and that it wouldn't be repaid. There have been no objections whatsoever to that particular piece of evidence that have been presented by the appellees, Your Honors. And there have been, again, no demands for payment. Now, Mr. Schrader suggests that Mr. Byford did in fact make oral arguments, but when you read the transcript of the depositions, whether or not they've been made part of the record on appeal, you'll see that the timing of that is immediately preceding the attorney's demand. Why should we read transcripts that have not been made part of the record on appeal? I believe, Your Honor, that we are not allowed to read anything that's not part of the record on appeal. Well, Your Honor, to that extent, I don't recall specifically if portions of the transcript of the appellee's deposition were submitted to the court as part of the record on appeal. In fact, I could probably take a look at that. But the facts and evidence, Your Honors, clearly show that the timing of his so-called verbal demands immediately preceded the attorney demands once the attorney's got involved. Again, prior to that time, there was absolutely no demand made to the appellants for repayment of the obligation. And I see that I'm running short on time. I want to also say that, with respect, we thank you, Your Honors, for your time this morning. We appreciate you having us tonight. Thank you, Madam, for your consideration. And we wish you all the best for your new course. Thank you.